**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re | Chapter 15 |
| Calfrac Well Services Corp., *et al.*,[1] | Case No. 20-33529 (DRJ) |
| Debtors in a Foreign Proceeding | Joint Administration Requested |

### VERIFIED PETITION FOR RECOGNITION AND CHAPTER 15 RELIEF

A HEARING WILL BE CONDUCTED ON THIS MATTER AT A TIME TO BE DETERMINED BY THE COURT IN COURTROOM 400, 4th FLOOR, 515 RUSK STREET, HOUSTON, TX 77002. IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE PETITION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

Please note that on March 24, 2020, through the entry of General Order 2020-10, the Court invoked the Protocol for Emergency Public Health or Safety Conditions.

It is anticipated that all persons will appear telephonically and also may appear via video at this hearing.

Audio communication will be by use of the Court's regular dial-in number. The dial-in number is +1 (832) 917-1510.  You will be responsible for your own long-distance charges. You will be asked to key in the conference room number. Judge Jones' conference room number is 205691.

Parties may participate in electronic hearings by use of an internet connection. The internet site is www.join.me. Persons connecting by mobile device will need to download the free join.me application.

Once connected to www.join.me, a participant must select "join a meeting". The code for joining this hearing before Judge Jones is "judgejones". The next

---

[1]     The Chapter 15 Debtors, along with the last four digits of each U.S. Debtor's federal tax identification number, where applicable, are as follows: Calfrac Well Services Corp. ("**CWSC**") (1738), 12178711 Canada Inc. ("**Arrangeco**"), Calfrac Well Services Ltd. ("**Calfrac**") (3605), Calfrac (Canada) Inc. ("**CCI**"), and Calfrac Holdings LP ("**CHLP**") (0236).

screen will have a place for the participant's name in the lower left corner. Please complete the name and click "Notify".

Hearing appearances should be made electronically and in advance of the hearing.  You may make your electronic appearance by:

1) Going to the Southern District of Texas website;

2) Selecting "Bankruptcy Court" from the top menu;

3) Selecting "Judges' Procedures & Schedules;"

4) Selecting "view home page" for Judge David R. Jones;

5) Under "Electronic Appearance," select "Click here to submit Electronic Appearance;"

6) Select "Calfrac Well Services Corp., et al." from the list of Electronic Appearance Links; and

7) After selecting "Calfrac Well Services Corp., et al." from the list, complete the required fields and hit the "Submit" button at the bottom of the page.

Submitting your appearance electronically in advance of the hearing will negate the need to make an appearance on the record at the hearing.

Ronald P. Mathison, in his capacity as the foreign representative (the "**Foreign Representative**" or the "**Petitioner**") of the above-captioned debtors (collectively, the "**Chapter 15 Debtors**"), in a foreign reorganization proceeding (the "**Canadian Proceeding**") under Section 192 of the *Canada Business Corporations Act* (the "**CBCA**") currently pending before the Court of Queen's Bench of Alberta (the "**Canadian Court**"), respectfully submits this petition (the "**Petition**") seeking entry of an order, substantially in the form attached hereto as Exhibit A (the "**Recognition Order**")**,** granting: (a) recognition by this Court of the Foreign Representative as the Chapter 15 Debtors' "foreign representative" as defined in § 101(24) of title 11 of the United States Code (the "**Bankruptcy Code**"); (b) recognition of the Canadian Proceeding as a "foreign main proceeding" pursuant to Bankruptcy Code §§ 1515, 1517, and 1520; (c) in the alternative, recognition of the Canadian Proceeding as a "foreign non-main proceeding" pursuant to

Bankruptcy Code §§ 1515 and 1517; and (d) recognition of the Canadian Court's orders in connection with the Canadian Proceeding pursuant to Bankruptcy Code § 1521.[2]

## PRELIMINARY STATEMENT

1.     Calfrac and all of its direct and indirect subsidiaries (collectively, the "**Calfrac Group**") provide specialized energy services to oil and natural gas producers in Canada, the United States ("the "**U.S.**"), Russia and Argentina.  The Calfrac Group's services are focused primarily on hydraulic fracturing, coiled tubing and cementing, but it also provides other well stimulation services designed to increase the production of hydrocarbons from wells.

2.     Calfrac is a public company whose common shares (the "**Common Shares**") trade on the Toronto Stock Exchange ("**TSX**") under the symbol "CFW".  As of the date hereof, Calfrac has 145,171,194 issued and outstanding Common Shares.  Calfrac directly or indirectly controls or owns all the other entities in the Calfrac Group, including all the Chapter 15 Debtors.

3.     The Calfrac Group's business was established in June 1999 in Calgary, and it began operations with a single coiled tubing unit operating in Medicine Hat, Alberta in August 1999. By December 31, 2001, Calfrac had expanded its fleet of equipment to seven fracturing spreads and six coiled tubing units, and had established additional field stations in Red Deer and Grande Prairie, Alberta.  With the commencement of operations in Platteville, Colorado during 2002, Calfrac began a period of significant international expansion in parallel with the continued growth of its Canadian business.  This international expansion continued with entries into the well servicing markets of Russia (2005), Mexico (2007), Argentina (2008), Colombia (2011) and the incremental expansion of its footprint in the US through to 2017.

---

[2]     In support of the Petition, the Foreign Representative has filed contemporaneously herewith the *Declaration of Ronald P. Mathison in Support of Petition for Recognition and Chapter 15 Relief (the "**Mathison Declaration**")* and the *Declaration of Chris Simard in Support of Petition for Recognition and Chapter 15 Relief (the "**Simard Declaration**")*, which are incorporated herein by reference.

4.      Calfrac's entry into the foreign markets mentioned above was orchestrated by the management team in Calfrac's Calgary head office (the "**Calgary Head Office**") and strategically executed by deploying key management and/or operational personnel from Canada to the respective foreign countries to oversee the establishment and implementation of the business consistent with Calfrac's financial and operating principles and procedures developed at the Calgary Head Office.

5.      As a response to recent challenges, related to both the COVID-19 pandemic and the enduing OPEC oil price war (as more fully described below), the Chapter 15 Debtors initiated the Canadian Proceeding in order to effectuate a recapitalization transaction (the "**Recapitalization Transaction**") that right-sizes their capital structure, reduces their annual interest expenses, and increases their working capital and liquidity.

6.      These chapter 15 cases (the "**Chapter 15 Cases**")[3] are brought in United States Bankruptcy Court for the Southern District of Texas (this "**Court**") in order to grant full force and effect to any orders issued pursuant to the Canadian Proceeding, as well as grant the Chapter 15 Debtors emergency provisional relief that affords them the breathing room necessary to implement the Recapitalization Transaction free from any enforcement actions or collection efforts against their assets in the United States.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334.

8.      This case was properly commenced pursuant to Bankruptcy Code § 1504 by the filing of a petition for recognition of the Canadian Proceeding under Bankruptcy Code § 1515.

9.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

---

[3]      Concurrently with the filing of the Petition, the Petitioner filed the *Motion for Order Pursuant to Bankruptcy Rule 1015(b) Directing Joint Administration of Chapter 15 Cases*, pursuant to which the Petitioner seeks joint administration of the Chapter 15 Cases for procedural purposes only.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1410(1) and 1410(3).

11.     The statutory bases for relief are Bankruptcy Code §§ 1504, 1515, 1517, 1520, and 1521.

**BACKGROUND**

## I.     The Foreign Representative

12.     The Foreign Representative is the co-founder, the Executive Chairman and a director of Calfrac, a Director and Chairman of CCI, and a director of Arrangeco.  By virtue of these roles, the Foreign Representative is fully aware of the Chapter 15 Debtors' businesses and financial affairs, has been closely involved in their restructuring efforts, and has a thorough understanding of the Recapitalization Transaction contemplated under the Canadian Proceeding. The Foreign Representative has been duly appointed as foreign representative by order of the Canadian Court authorizing him to act in that capacity in respect of the Canadian Proceeding in these Chapter 15 Cases and regarding the relief requested by this Petition.

## II.     The Chapter 15 Debtors' Structure

13.     Calfrac.  Calfrac is a corporation amalgamated under the Alberta *Business Corporations Act*, R.S.A. 2000, c. B-9, as amended (the "**ABCA**").  Calfrac is the parent entity in the Calfrac Group and also the Canadian operating entity.  As noted above, Calfrac is a public company whose Common Shares trade on the TSX under the symbol "CFW".  As of the date hereof, Calfrac has 145,171,194 issued and outstanding Common Shares.

14.     CCI.  CCI is a corporation incorporated under the ABCA, is fully-owned subsidiary of Calfrac, and is the general partner of CHLP.

15.     CHLP.  CHLP is a partnership registered pursuant to the laws of the State of Delaware.  Calfrac holds 98.9% of the limited partnership units of CHLP and CCI holds the remaining 1.1% of the limited partnership units.  CHLP has no material assets and conducts no operations, and its purpose was limited to the issuance of certain except in connection with the issuance of the Second Lien Notes (as defined below).

16.     CWSC.  CWSC is a corporation incorporated pursuant to the laws of the State of Colorado, U.S.A.  CWSC is a fully owned subsidiary of Calfrac and acts as the United States operating entity.

17.     Arrangeco.  Arrangeco is a corporation incorporated pursuant to the CBCA and is a fully owned subsidiary of Calfrac.  Arrangeco has no liabilities and no operations.  It is anticipated that as part of the Recapitalization Transaction, Arrangeco will amalgamate with some or all of the corporations in the Calfrac Group.

## III.     The Business and History of the Chapter 15 Debtors

18.     The Calfrac Group is a leading independent global provider of specialized oilfield services including fracturing, coiled tubing, cementing and other well stimulation services which are designed to increase the production of hydrocarbons from wells. As noted above, the Calfrac Group's operations are currently conducted in Canada, the United States, Argentina, and Russia.

### (a)     The Calfrac Group's Business Segments

19.     Fracturing Services.  The Calfrac Group's primary service line in all jurisdictions is fracturing.  This segment is able to provide fracture stimulation services for both conventional and unconventional (shale) wells and can deploy a wide range of fracturing fluid solutions as required by the client's well completion program.  The Calfrac Group is estimated to have the eighth largest fracturing services fleet (as measured by hydraulic horsepower capacity) in North America, the third largest fracturing fleet in Canada by horsepower, and was the second largest fracturing operator by revenue in Canada in 2019.

20.     <u>Coiled Tubing Services</u>.  Calfrac's Coiled Tubing service line operates in Canada, Argentina and Russia. In Canada, the segment's primary focus is supporting the provision of specialized fracturing services in Western Canada.  Additionally, the segment provides some call-out well service work, typically completed after a fracturing operation has been executed. In Argentina and Russia, the segment is more stand-alone, and operates primarily as a well servicing business, working on wells already on production as well as some post-fracturing operations.

21.     <u>Cementing Services</u>.  The Calfrac Group only operates cementing services in Argentina, although a number of employees with the group have extensive experience in cementing in North America and other jurisdictions. In Argentina, the cementing segment provides both primary cementing services (the process of securing and isolating a new well bore, by pumping cement between the steel casing string and the rock formation around it) and remedial cementing services (a process of conducting cementing operations on an already existing wellbore).

*(b)      The Calfrac Group's Business History*

22.     The Calfrac Group's business was established in June 1999 in Calgary, and it began operations with a single coiled tubing unit operating in Medicine Hat, Alberta in August 1999. By December 31, 2001, Calfrac had expanded its fleet of equipment to seven fracturing spreads and six coiled tubing units, and had established additional field stations in Red Deer and Grande Prairie, Alberta.

23.     With the commencement of operations in Platteville, Colorado during 2002, Calfrac began a period of significant international expansion in parallel with the continued growth of its Canadian business.  This international expansion continued with entries into the well servicing markets of Russia (2005), Mexico (2007), Argentina (2008), Colombia (2011) and the incremental expansion of its footprint in the US through to 2017.

24.     Described below are some additional relevant operational milestones to showcase examples of how the Calfrac Group has grown, shifted and altered its activities in different regions, in response to domestic oil and gas market conditions and the related demand for oilfield services, among other factors:

- in 2005 the Calfrac Group opened a facility in Grand, Junction, Colorado, as well as its fourth Canadian district office in Strathmore, Alberta;

- in 2007, the Calfrac Group opened an operating base in Edson, Alberta, and acquired a Canadian competitor for approximately CAD$24.9 million;

- in 2009, the Calfrac Group:  established operating bases in Dawson Creek, British Columbia and Poza Rica, Mexico; acquired Pure Energy Services Ltd., a U.S. competitor for approximately CAD$44.5 million; and acquired Century Oilfield Services Inc., a Canadian competitor for approximately CAD$100 million;

- in 2010, the Calfrac Group established a presence in the Marcellus region in Smithfield, Pennsylvania and the Bakken region in Williston, North Dakota;

- in 2012 the Calfrac Group opened facilities in Smithfield, Pennsylvania and Williston, North Dakota;

- in 2013, the Calfrac Group acquired certain assets of Mission Well Services, LLC, a U.S. competitor, for approximately CAD$150.5 million, including its Eagle Ford basin operating base in San Antonio, Texas;

- in 2015, the Calfrac Group withdrew from Colombia and established operating bases at Kindersley, Saskatchewan and Comodoro Rivadavia, Argentina;

- in 2016, the Calfrac Group temporarily suspended its activities out of its Medicine Hat, Alberta, and San Antonio, Texas operating facilities;

- in 2017, the Calfrac Group closed all its operations in Mexico and established an operating base in Artesia, New Mexico serving the Permian Basin;

- in 2019, the Calfrac Group acquired equipment and spare parts from an Argentine competitor for approximately $17.3 million and sold its operating base in Platteville, Colorado in the fourth quarter of 2019; and

- in 2020, the Calfrac Group temporarily reduced personnel in San Antonio, Texas and Artesia, New Mexico to non-operational levels.

25.    As noted above, Calfrac's entry into the foreign markets mentioned above was orchestrated by the management team in the Calgary Head Office and strategically executed by deploying key management and/or operational personnel from Canada to the respective foreign countries to oversee the establishment and implementation of the business consistent with Calfrac's financial and operating principles and procedures developed at the Calgary Head Office.

26.    As the challenges to the global energy markets evolved over recent years, the opportunities for growth in certain markets declined and the Calfrac Group's management team in Calgary took steps to rationalize its global operating footprint by allocating equipment and resources to regions and services with relatively superior field activity and operating margins, as evidenced by: the closure of operations in Colombia in 2015, Mexico in 2017 and Platteville, Colorado in 2019; the temporary reduction of personnel in San Antonio, Texas and Artesia, New Mexico to non-operational levels in 2020; the cessation of cementing operations in Canada in 2010 and the U.S. in 2016; and the cessation of coiled tubing services in the U.S. in 2016.

27.     The Calfrac Group's ability to reallocate equipment and operating personnel to more economically favourable operating areas with relatively low investment is key to its business model.  However, the Calfrac Group maintains, and intends to further maintain, its nerve center and corporate decision-making in Canada.

28.     The structure of the Calfrac Group, specifically its presence in both Canada and the United States, provides a number of benefits to its stakeholders.  Customers benefit from lessons learned and innovations uncovered in basins where they have no presence, and this knowledge transfer can significantly improve the learning curve for the Calfrac Group's customers that in many cases depend on service companies for new ideas.  For investors, the ability to cost-efficiently reposition assets to economically favourable operating areas is a valuable one and cannot be replicated by unaffiliated entities at the same cost in aggregate.  Additionally, having a presence in multiple basins can be a source of new business as producers expand into new areas. Finally, a number of the processes the Calfrac Group has embraced are only possible due to its overall scale.   Implementing the Calfrac Group's scope of Quality, Health, Safety, and Environment ("**QHSE**") processes and procedures and other administrative support systems do not represent a compelling investment for smaller, basin-specific service companies.  The size and breadth of the operations of the Calfrac Group allow it to bring these best-in-class approaches to all of its operating areas, which are generally not actionable by smaller competitors who lack the global experience and scalability of the Calfrac Group.

(c)     *The Calgary Head Office*

29.     All legal strategy and direction for all of the entities in the Calfrac Group is centralized in the Calgary Head Office.  Similarly, supply chain strategy and decisions for the entire Calfrac Group are centralized in the Calgary Head Office.

30.     All of the following policies, procedures, operating manuals and operating practices are developed, updated and administered in the Calgary Head Office, and are applied across all the Calfrac Group entities:

- Human Resources – including employee policies and procedures, benefits, wellness, confidentiality and privacy policies;

- Corporate Accounting policies;

- Code of Ethics;

- Corporate Standards;

- Information and Telecommunications policies and procedures;

- Engineering and Technology policies and procedures, including lab safety, training and development, and product development; and

- Marketing and Communications policies and procedures.

31.     The global QHSE functions for all of the entities in the Calfrac Group are centralized in Calgary, at the Calgary Head Office.  Among other things, the QHSE department of Calfrac is responsible for developing and implementing QHSE policies and procedures to ensure that the Calfrac Group's equipment is maintained and operated in a standardized fashion to ensure consistent, safe, efficient and effective operations across the Calfrac Group's operating divisions.

32.     All technology and information systems are designed and implemented by the information systems management team, who are all located in the Calgary Head Office.  Calfrac's information systems team has recently led the implementation of a cloud-based enterprise-resource planning system in the Canadian, US and Argentina divisions in order to provide greater transparency, reliability, efficiency and control over financial and operational data to facilitate the centralized decision-making structure of the Calfrac Group.

33.     Research and development is a key business priority for the Calfrac Group, and has been a major contributing factor to our success in the market and against our competitors. Calfrac Group's main research and development laboratory facility (the "**Calgary R&D Lab**") is based in Calgary.  The Calgary R&D Lab develops and tests technologies and fluid systems for the benefit of all of the entities in the Calfrac Group.  Accordingly, the Calfrac Group has developed significant intellectual property related to its business operations, with patents and trademarks held and pending in Canada and the US.  The patents and trademarks are all held by Calfrac.  Calfrac authorizes the other entities in the Calfrac Group to utilize this valuable intellectual property.  None of the Calfrac Group's patents or trademarks are held by the U.S. entities in the Calfrac Group.  The use of this intellectual property is critical to the ongoing business operations of Calfrac and CWSC.

## IV.     Summary of the Chapter 15 Debtors' Capital Structure

34.     _The Credit Facility_.  Calfrac, as borrower, is party to an Amended and Restated Credit Agreement dated April 30, 2019 (the "**Credit Agreement**").  HSBC Bank Canada ("**HSBC**") is the Lead Arranger, Sole Bookrunner and Administration Agent pursuant to the Credit Agreement (in these capacities, the "**First Lien Agent**").  The lenders (the "**First Lien Lenders**") party to the Credit Agreement are:

- HSBC;

- ATB Financial;

- Royal Bank of Canada;

- Canadian Imperial Bank of Commerce;

- Export Development Canada; and

- The Bank of Nova Scotia.

35.     CWSC and CHLP (by its general partner CCI) have guaranteed Calfrac's obligations under the Credit Agreement.  The Credit Agreement provides Calfrac with a $40 million operating credit facility and a $335 million syndicated credit facility.  As a result of the borrowing base calculation under the Credit Agreement, Calfrac's current availability under the Credit Agreement is approximately $233.8 million and the amount currently outstanding is approximately $173.5 million.  The First Lien Lenders have a first-ranking security interest in all of the assets of Calfrac, CWSC and CHLP (by its general partner CCI), to secure those parties' respective obligations as borrower and guarantors in connection with the Credit Agreement.

36.     It is anticipated that the Canadian Proceeding and the Recapitalization Transaction contemplated thereunder will not compromise or affect the First Lien Lenders, and that Calfrac will continue to perform all of its obligations under the Credit Agreement in the ordinary course of business.

37.     <u>The Second Lien Notes</u>.  CHLP (by its general partner CCI), as issuer, is party to an Indenture dated February 14, 2020 (the "**Second Lien Note Indenture**").  Pursuant to the Second Lien Note Indenture, CHLP issued 10.875% Second Lien Secured Notes (the "**Second Lien Notes**") due in 2026, in the principal amount of $120,000,100.  Wilmington Trust, National Association, is the trustee and collateral agent in the U.S. pursuant to the Second Lien Note Indenture (the "**Second Lien Note Trustee**").  Computershare Trust Company of Canada is the collateral agent in Canada.  Calfrac and CWSC have guaranteed CHLP's obligations under the Second Lien Note Indenture.  The Second Lien Note Trustee has a second-ranking security interest in all of the assets of CHLP (by its general partner CCI), Calfrac and CWSC, to secure those parties' respective obligations as issuer and guarantors in connection with the Second Lien Note Indenture.

38.     The Second Lien Notes were issued by CHLP in connection with an exchange offer whereby CHLP issued a $120,000,100 principal amount of the Second Lien Notes in exchange for a $218,182,000 principal amount of unsecured notes (the "**Exchange Offer**").

39.     Interest payments under the Second Lien Notes are due semi-annually in arrears on March 15 and September 15.  CHLP (by its general partner CCI) duly made the March 15, 2020 interest payment, in the amount of approximately $1,123,750.

40.     It is anticipated that the Canadian Proceeding and the Recapitalization Transaction contemplated thereunder will not compromise or affect the holders of the Second Lien Notes (the "**Second Lien Noteholders**"), and that CHLP (by its general partner CCI) will continue to perform all its obligations under the Second Lien Note Indenture, in the ordinary course of business.

41.     The 1L/2L Intercreditor Agreement.  Calfrac, CWSC and CHLP (by its general partner CCI), are parties with the First Lien Agent and the Second Lien Note Trustee, to a February 14, 2020 Intercreditor and Priority Agreement (the "**1L/2L Intercreditor Agreement**").  Pursuant to the 1L/2L Intercreditor Agreement, the parties thereto have agreed, among other things, that: (a) all the security held by the First Lien Agent (the "**First Lien Security**") shall rank senior in priority to all the security held by the Second Lien Note Trustee (the "**Second Lien Security**"); and (b) neither the Second Lien Note Trustee nor any Second Lien Noteholder is entitled to take any enforcement action under the Second Lien Security until at least 180 days after the Second Lien Note Trustee has given the First Lien Agent a notice of the occurrence of an event of default under the Second Lien Note Indenture.

42.     The Unsecured Notes.  CHLP (by its general partner CCI), as issuer, is party to an Indenture dated May 30, 2018 (the "**Unsecured Note Indenture**").  Pursuant to the Unsecured Note Indenture, CHLP (by its general partner CCI) issued 8.50% Senior Unsecured Notes (the "**Unsecured Notes**") due in 2026, in the principal amount of $650 million.  Wells Fargo Bank, National Association, is the trustee pursuant to the Unsecured Note Indenture (the "**Unsecured Note Trustee**").  Calfrac and CWSC have guaranteed the issuer's obligations under the Unsecured Note Indenture.  There are $431,818,000 in principal amounts of Unsecured Notes outstanding, after giving effect to the Exchange Offer.

43.     Interest payments under the Unsecured Notes are due semi-annually in arrears on June 15 and December 15.  CHLP (by its general partner CCI) deferred making the June 15, 2020 interest payment, in the amount of $18,352,265.  Pursuant to the Unsecured Note Indenture, there is a 30-day grace period during which CHLP (by its general partner CCI) can make the interest payment, to avoid committing an event of default under the Unsecured Note Indenture.  Non-payment of the interest payment prior to the expiry of the grace period would result in cross-defaults under the Credit Agreement and the Second Lien Note Indenture.

44.     Given the pendency of the Canadian Proceeding and the Recapitalization Transaction contemplated thereunder, and to preserve the Calfrac Group's liquidity, CHLP (by its general partner CCI) has determined not to make the interest payment prior to the expiry of the grace period on July 15, 2020.  It is for this reason that the Chapter 15 Debtors have asked the Canadian Court to grant a stay of enforcement proceedings and a direction that the grace period for the payment of the interest payment due on June 15, 2020 under the Unsecured Note Indenture (along with all other grace periods or limitation periods), be deemed to be tolled and extended for the duration of the stay of proceedings, subject to further order of the Canadian Court.  For the same reason, the Foreign Representative seeks the relief requested herein.  Such relief would preserve the fair and equitable treatment among all the Calfrac Group's stakeholders, while the Canadian Proceeding and the Recapitalization Transaction contemplated thereunder are in process.

45.     It is anticipated that the Canadian Proceeding and the Recapitalization Transaction contemplated thereunder will compromise or affect the holders of the Unsecured Notes (the "**Unsecured Noteholders**"), and accordingly that the Unsecured Noteholders will be asked to vote to approve the arrangement to be proposed before the Canadian Court in the Canadian Proceeding to effectuate the Recapitalization Transaction (the "**Arrangement**").

46.     <u>Equity</u>.  The authorized share capital of Calfrac consists of an unlimited number of Common Shares. As of the date hereof, Calfrac has 145,171,194 issued and outstanding Common Shares, 9,858,981 stock options and 890,770 equity-based performance shares units outstanding.

47.     It is anticipated that the Canadian Proceeding and the Recapitalization Transaction contemplated thereunder will compromise or affect the holders of the Common Shares (the "**Common Shareholders**"), and accordingly that the Common Shareholders will be asked to vote to approve the Arrangement.

48.     There are multiple large Common Shareholders who are currently engaged with the Calfrac Group regarding the Arrangement and Recapitalization Transaction, all of whom are expected to be supportive of the transactions contemplated thereunder.  In the aggregate, those Common Shareholders hold approximately 38.0% of the Common Shares (including the Calfrac board of directors (the "**Board**") and management, who are supportive and who collectively hold approximately 4%).

## V.     **Market Challenges and Recent Issues**

### (a)     *Challenges in the Global Energy Market, and in particular, the Oilfield Services Industry*

49.     Global energy markets have been experiencing numerous industry challenges, including significant downward pressure on commodity prices, in recent years.  Very recently, beginning in the first quarter of 2020, global energy markets and commodity prices have suffered precipitous declines due to material oversupply as a result of both a historic and unprecedented drop in demand as a result of the global COVID-19 crisis, as well as the price war between the OPEC+ countries, including Saudi Arabia and Russia.

50.     Severely depressed energy prices have resulted in oil and gas exploration and production companies, who are the Calfrac Group's customers, materially reducing their capital expenditure budgets.  These capital expenditure reductions have in turn resulted in a precipitous decline in the demand for oilfield services, and in particular fracturing services, which accounts for greater than 90% of the Calfrac Group's revenues.  The combined effects of depressed commodity prices, reduced capital spending by oil and gas producers and resulting excess well servicing equipment has created an intensely competitive environment within the oilfield services market.  These factors have collectively created unsustainable pricing and activity levels in the oilfield services industry that have directly and negatively impacted the revenues and profitability of oilfield service companies like the Calfrac Group and its competitors.

(b)      *Challenges Specific to the Western Canadian Energy Market*

51.      These challenges have been particularly amplified in Western Canada, and have had a materially greater negative impact in this market since 2014.  While Western Canadian energy producers compete to sell their products in an integrated global market, a number of factors disadvantage them against their global, and particularly their U.S., competitors.

52.      Because of a lack of new and expanded pipeline egress capacity from Western Canada, and the resulting limited export market access, Western Canadian oil and natural gas producers have experienced lower pricing relative to other North American and global markets over the past decade.  The price differential per barrel for Western Canadian crude versus West Texas Intermediate has been as high as $47 (in October 2018) in the last few years.  Natural gas prices in Alberta and British Columbia have also been very constrained in recent years.

53.      This has compromised the ability of Western Canadian energy producers to operate profitably and attract capital for growth, relative to their U.S. peers.  The capital budgets of Western Canadian oil and gas producers have been reduced more severely and negatively relative to other markets, particularly the U.S.  This has resulted in greater negative impacts on oilfield services activity in Western Canada relative to the U.S.

54.      As is described in greater detail below, these market dynamics have required the Calfrac Group to continue executing on its strategy of flexibly allocating its field workforce and equipment to its most active and profitable operating areas.  This allocation has resulted in Calfrac moving assets out of a structurally impaired Canadian marketplace and consistently growing its presence in a number of basins in the U.S.  This continuous reallocation of assets has allowed the Calfrac Group to maintain acceptable financial performance and a strong market position in Canada, while executing a lower-cost growth strategy in the U.S., focused on gaining scale in specific markets while managing client risk prudently.

55.     The various proposals currently in progress to increase Western Canadian oil producers' access to international markets (including the TMX and Keystone XL pipeline expansions) are anticipated to improve Calfrac's Western Canadian customers' relative competitiveness and the returns available to oilfield services companies in Canada, but the timing and magnitude of these developments remain uncertain.  Should the demand for pressure pumping services in Western Canada grow materially as a result of improved market access and cash flow for produced commodities, the Calfrac Group in its current configuration retains the ability to redeploy a significant amount of assets to ensure balance in the marketplace, without requiring significant capital outlays.

(c)     *Recent Events*

56.     Due to the COVID-19 global pandemic and the ensuing OPEC oil price war, oil prices fell to historic lows, including negative prices in certain markets, and as a result, well completion activity in North America declined by almost 90% and was completely shut down in Argentina by a mandatory government decree.  By way of illustration, the number of active fracturing fleets in the US fell from 317 as of the first week of March 2020 to a low of 45 active fleets during the weeks of May 15 and May 22.  In addition, the total U.S. and Canadian rig counts as of on or around July 3, which are proxies for future demand for the Calfrac Group's services in those markets, were at or near all-times lows of 263 and 18, respectively.

57.     For the Calfrac Group, this meant a severe reduction in work was experienced in a matter of a few weeks after the Exchange Offer.  In North America, from a high of 18 active fracturing fleets in the first quarter of 2020, only one fracturing fleet was generating revenue at points in the month of May.  In Argentina, all of the Calfrac Group's operations were shut down by a mandatory governmental decree.  In Russia, the Calfrac Group was able to manage the COVID-19 restrictions without materially affecting ongoing operations, however, this activity was insufficient to overcome the pricing and activity declines experienced by the rest of the Calfrac Group's operating divisions.

58.     For the Calfrac Group, this material degradation of global industry fundamentals has created a challenging liquidity position where the current capital structure is no longer tenable.  Prior to these events, the Calfrac Group had been aware of the risks of elevated debt levels and in response had devised a multi-year plan to address this issue, in advance of the 2026 maturities of its debt instruments.  In spite of the challenges the industry has faced since late 2014, the Calfrac Group felt it was in a position to reduce its debt level over the medium- to long-term, and would be able to withstand a normal, cyclical downturn during that process.  What was not contemplated or foreseeable was the scale of reduction in the business in a matter of weeks as a result of the oil market collapse caused by COVID-19 and the OPEC price war, and the consequent impacts on liquidity.

59.     These challenges have resulted in, among other things, a capital structure and liquidity position that is no longer sustainable in light of the Company's operating income, and inadequate financial flexibility for the Calfrac Group to effectively advance its business going forward.

## VI.    The Recapitalization Transaction

60.     The Calfrac Group, with the assistance of its financial and legal advisors, proactively undertook a financial structure review process, in consultation with certain of its key stakeholders, with a view to improving the Calfrac Group's capital structure and access to liquidity, addressing the Calfrac Group's leverage, strengthening its financial position and maximizing value for its stakeholders.

61.     In early 2020, Chapter 15 Debtors engaged their legal advisors (Bennett Jones LLP in Canada and Latham & Watkins, LLP in the U.S.) and their financial advisors (RBC Capital Markets and Tudor, Pickering, Holt & Co. in Canada and Perella Weinberg Partners LP in the U.S.) to assist them in developing the Recapitalization Transaction, which has the goals of: (a) right-sizing the Chapter 15 Debtors' capital structure, (b) reducing their annual interest expenses, and (c) increasing the their working capital and liquidity.

62.     The stakeholders who are proposed to be affected by the Arrangement are the holders of the Unsecured Notes and holders of the Common Shares (collectively hereinafter referred to as the "**Affected Securityholders**").  To advance the Recapitalization Transaction, the Calfrac Group and its advisors have engaged in discussions with the Affected Securityholders, other stakeholders, and their respective representatives.  Based on the size and nature of the obligations owed to the Affected Securityholders and the composition of the Affected Securityholders, the Chapter 15 Debtors and their Foreign Representative believe that an arrangement is required to implement the Restructuring Transaction and that a consensual Recapitalization Transaction will provide the best opportunity for the Calfrac Group to achieve a sustainable capital structure, and to preserve and maximize current and future value for all its stakeholders.

63.     While exact details of the Recapitalization Transaction are still subject to discussion with the engaged group of Affected Securityholders, it is contemplated that the Recapitalization Transaction will have the following core elements.

64.     It is contemplated that the Recapitalization Transaction will not affect or compromise the following stakeholders:

- the Calfrac Group's secured creditors (the First Lien Lenders and the Second Lien Noteholders, both as defined below);

- the Calfrac Group's customers;

- the Calfrac Group's employees; and

- the Calfrac Group's trade creditors.

65.     The Recapitalization Transaction is expected to significantly reduce the Calfrac Group's outstanding indebtedness, to reduce annual cash interest payments and increase liquidity and working capital so that the business can operate sustainably.  Specifically, the Recapitalization Transaction, as it is currently contemplated, will, among other things, reduce the Calfrac Group's total debt by approximately $431,818,000 million and reduce its annual cash interest payments by approximately $36,704,530.

66.     Following completion of the Recapitalization Transaction (which is anticipated to include an amalgamation of certain parties to this Action), it is expected that the realizable value of the Calfrac Group's assets will not be less than the aggregate value of their liabilities and stated capital, and that the members of the Calfrac Group will be able to meet their obligations as they become due.

67.     Following a consideration of various alternatives in consultation with its financial and legal advisors, the Calfrac Group are of the view that the proposed Recapitalization Transaction is the best available option in the circumstances and is in the best interests of the Calfrac Group and its stakeholders.

68.     The Calfrac Group and its advisors continue to work with its stakeholders to advance and finalize the terms of the Recapitalization Transaction.  There has been substantial progress made in discussions with the key stakeholders to date.  With the benefit of the Preliminary Interim Order entered by the Canadian Court, the Chapter 15 Debtors and the Foreign Representative believe that the parties will be able to finalize definitive agreements in the short term, after which the Calfrac Group intends to bring an application for an Interim Order under the CBCA, seeking authority to call meetings of its Affected Securityholders, to vote on the Arrangement.

69.     Importantly, the First Lien Lenders support the current process. In this regard, the First Lien Lenders confirmed on July 10, 2020 that, to the extent that the commencement of the Canadian Proceeding is an event of default under the Credit Agreement, such event of default has been waived.

VII.    **The Chapter 15 Debtors' Connections to the United States and to Canada**

70.     The Calfrac Group's business is fully integrated, with the "nerve center" for the entire group based in Calgary, Canada.  A strong majority of the Chapter 15 Debtors' directors and/or executive officers are all residents of Calgary or the surrounding areas and perform their duties out of the Calgary Head Office.  Only six out of the twenty-one Chapter 15 Debtors' directors and/or executive officers are not residents of Calgary and do not typically perform their duties exclusively out of the Calgary Head Office.

71.     Furthermore, as stated above, all legal strategy and direction for all of the entities in the Calfrac Group, all supply chain strategy and direction decisions, and most global QHSE functions, technology and information systems, and research and development activity is centralized at the Calgary Head Office.  Additionally, the authority to submit bids or enter into binding agreements with the Calfrac Group's customers and counterparties resides in Calgary.

72.     Still, the Calfrac Group's operations in the United States are significant.  The Calfrac Group maintains an office in Houston, Texas (out of which the Chief Operating Officer of Calfrac, CCI, CWSC, and CHLP operates in addition to the Calgary Head Office) and, as stated above, conducts extensive operations in the United States.

73.     Both in terms of fracturing horsepower count[4] and revenue, there have been fluctuation from year to year as between Canada and the US, as the Calfrac Group has redeployed equipment to respond to changing markets.  2019 was the end-of-year quarter with the highest percentage horsepower deployed in the US as compared to Canada, and 2010 was the lowest.  In 2010, Canada represented 51.0% of horsepower, and the US represented 49.0%.  The Calfrac Group's current horsepower breakdown as between all countries for the final quarter of 2019 is as follows:

| (as measured in Q4) | Canada | USA | Russia | Argentina |
| --- | --- | --- | --- | --- |
| **Horsepower (2019)** | 271,950 | 923,450 | 77,000 | 137,750 |
| **Percentage** | 19.29% | 65.49% | 5.46% | 9.76% |

---

[4]     Horsepower is a leading measurement of an entity's operational size in the fracturing industry. It measures the pumping capacity of a particular company's aggregate fracturing operations.

74.     In comparing revenue for the years 2010 to 2019, 2019 was the year with the highest percentage revenue coming from the US as compared to Canada, and 2010 was the lowest.   In 2010 Canada represented 62.7% of revenue as between the US and Canada, and the US only 37.3%.  In 2019 Canada represented 29.9% of revenue as between the US and Canada, and the US 70.1%. The current breakdown of gross revenue as between all countries as at December 31, 2019 is as follows.

| *(in thousands of Canadian dollars)* | Canada | USA | Russia | Argentina |
|---|---|---|---|---|
| **Revenue (2019)** | 397,583 | 930,404 | 105,807 | 187,161 |
| **Percentage** | 24.5% | 57.4% | 6.5% | 11.5% |

75.     Additionally, the charts below, in the order presented, show: (a) the current breakdown of where the Calfrac Group's North American coiled tubing[5] and cementing equipment units[6] currently reside as between all countries of operation for the final quarter of 2019, and (b) the numbers of each type of unit in all countries, as measured at the end of the year, from 2010 to 2019.

| *(as measured in Q4)* | Canada | USA | Russia | Argentina |
|---|---|---|---|---|
| **Coiled Tubing (2019)** | 14 | 1 | 7 | 6 |
| **Percentage** | 50% | 3.57% | 25% | 21.42% |
| | | | | |
| **Cementing (2019)** | 0 | 5 | 0 | 14 |
| **Percentage** | 0% | 26.32% | 0 | 73.68% |

| Coiled Tubing Units | 2010 | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|

---

[5]     Coil tubing units are mobile service rigs that assist with fracturing and can also execute a number of stand-alone well servicing operations, including removal of downhole equipment and debris, such as sand, from the wellbore

[6]     Cementing units pump cement slurry downhole which, when dry, provide isolation between the wellbore and the outside rock, particularly to prevent the ingress of unwanted water into the production stream and to isolate fresh water zones from hydrocarbon streams.

| | | 2011 | | | | | | | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 22 | 21 | 21 | 21 | 17 | 18 | 13 | 15 | 14 | 14 |
| United States | - | 1 | - | 7 | 5 | 5 | 5 | 1 | 2 | 1 |
| Russia | 6 | 6 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Mexico | - | - | - | - | 1 | 1 | 1 | 1 | - | - |
| Argentina | 1 | 1 | 1 | 3 | 6 | 6 | 6 | 6 | 6 | 6 |
| **Cementing Units** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| Canada | 6 | 5 | 1 | - | - | - | - | - | - | - |
| United States | 7 | 9 | 12 | 18 | 18 | 18 | 11 | 9 | 10 | 5 |
| Mexico | 3 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | - | - |
| Argentina | 5 | 5 | 5 | 7 | 8 | 8 | 13 | 13 | 13 | 14 |
| Columbia | - | 2 | 6 | 4 | 3 | 3 | - | - | - | - |

76.     As shown, most of the coiled tubing units are currently in Canada, and all of the cementing units, although not active, are currently in the US. The distribution and number of units has varied significantly over the years to respond to demand, and is another example of the flexibility the Calfrac Group exercises to optimize profitability.

**VIII.   The Chapter 15 Cases**

77.     To protect the Chapter 15 Debtors from actions in the U.S., whether against U.S. assets or otherwise, and to ensure recognition and enforcement in the U.S. of the Canadian Court orders in connection with the Canadian Proceeding, the Foreign Representative has filed these Chapter 15 Cases with this Court seeking: (a) recognition by this Court of the Foreign Representative as the Chapter 15 Debtors' "foreign representative" as defined in § 101(24) of the Bankruptcy Code; (b) recognition of the Canadian Proceeding as a "foreign main proceeding" pursuant to Bankruptcy Code §§ 1515, 1517, and 1520; and (c) recognition of the Canadian Court's orders in connection with the Canadian Proceeding pursuant to Bankruptcy Code § 1521.

78.     Congress enacted chapter 15 to ensure that a U.S. bankruptcy court can recognize and enforce actions and orders of a foreign court in a restructuring proceeding undertaken in a jurisdiction where the debtor has its "center of main interests" ("**COMI**") or an "establishment." Chapter 15 provides for both the granting of provisional relief during the pendency of the foreign proceeding, such as application of § 362 to U.S. assets, and recognition and enforcement in the U.S. of any orders entered in the foreign proceeding.

79.     Here, the Chapter 15 Debtors' corporate headquarters, the residence of a large majority of their directors' and/or executive officers, as well as their strategic and operational decision-making authority are all centered in Calgary, Canada, thereby establishing Canada as their COMI.  Furthermore, each of the Chapter 15 Debtors has an "establishment" in Canada as, among other things: (a) all employees and/or officers of the Chapter 15 Debtors ultimately report directly or indirectly to an officer or manager in Canada; (b) the majority of the Chapter 15 Debtors' directors and officers reside and work in Canada; and (c) the Calgary Head Office handles the majority of the Chapter 15 Debtors' core administrative and corporate functions, without which the Chapter 15 Debtors would be unable to operate.

## **RELIEF REQUESTED**

80.     By this Petition, the Foreign Representative respectfully requests that the Court enter an order: (a) granting recognition by this Court of the Foreign Representative as the Chapter 15 Debtors' "foreign representative" as defined in Bankruptcy Code § 101(24); (b) granting recognition of the Canadian Proceeding as a "foreign main proceeding" pursuant to Bankruptcy Code §§ 1515, 1517, and 1520 with respect to the Chapter 15 Debtors; (c) in the alternative, granting recognition of the Canadian Proceeding as a "foreign non-main proceeding" pursuant to Bankruptcy Code §§ 1515 and 1517; and (d) recognizing and enforcing the orders of the Canadian Court in connection with the Canadian Proceeding pursuant to § 1521.

**BASIS FOR RELIEF**

81.     Congress designed chapter 15 to protect assets and other interests in the U.S. for parties having commenced restructuring proceedings in a foreign jurisdiction.  Relief under chapter 15 prevents dismemberment of U.S. or non-U.S. businesses through actions commenced in the U.S. and avoids disruptions that otherwise could derail a party's foreign restructuring.

82.     Consistent with these principles, the Foreign Representative commenced the Chapter 15 Cases to obtain full recognition and enforcement of the Canadian Proceeding. The Foreign Representative anticipates the U.S. proceedings will complement the Chapter 15 Debtors' primary proceedings in Canada and ensure the effective and efficient administration of their restructuring.   The Foreign Representative submits that recognition of the Canadian Proceeding will allow the Chapter 15 Debtors to restructure in the most efficient manner.

**I.      The Canadian Proceeding is a Foreign Proceeding**

83.     Bankruptcy Code § 101 (23) defines a "foreign proceeding" as: "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

84.     Courts rely on a seven-factor test to determine whether a proceeding constitutes a "foreign proceeding."   Specifically, a "foreign proceeding" must be a proceeding: (a) in which "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;" (b) that has either a judicial or an administrative character; (c) collective in nature, in that it considers the rights and obligations of all creditors; (d) located in a foreign country; (e) authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent; (f) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and (g) for the purpose of reorganization or liquidation.  *See In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009); *see also In re Overnight and Control Commission of Avanzit, S.A.,* 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).

85.     As further supported by the facts discussed in the Mathison and Simard Declarations, the Chapter 15 Debtors' proceeding in the Canadian Court, commenced to restructure the Chapter 15 Debtors' financial obligations, constitutes a "foreign proceeding" under the aforementioned test.

86.     ***First,*** the Company commenced the Canadian Proceeding pursuant to § 192 of the CBCA, a law relating to adjustment of debts that specifically allows corporations to "apply to a court for an order approving an arrangement" that would "effect a fundamental change in the corporation." *See* CBCA § 192.3.

87.     ***Second,*** the proceeding is "judicial," having commenced before the Canadian Court, which has the power to enter "any interim or final order it thinks fit." *See* CBCA § 192.4.

88. **Third,** the Canadian Proceeding is collective in nature, considering all creditors' rights. Indeed, all creditor classes in the Canadian Proceeding either are unimpaired or impaired and entitled to participate in the proceedings.

89. **Fourth,** the Canadian Court is located in Alberta, Canada.

90. **Fifth,** as described above, the CBCA is a Canadian law governing, among other things, corporate restructuring, as contemplated by the Canadian Proceeding.

91. **Sixth,** the Canadian Court supervises the Chapter 15 Debtors' assets and affairs during the pendency of the Canadian Proceeding, as any party-in-interest seeking to object to the Arrangement may appeal to, and obtain relief from, the Canadian Court.

92. **Finally,** the Canadian Proceeding has one objective: the restructuring of the Chapter 15 Debtors. The Chapter 15 Debtors intend to submit, pursuant to the CBCA, a plan of arrangement implementing the Recapitalization Transaction, which will provide for a substantial de-leveraging of the Company's balance sheet and return the Company to profitability. The Foreign Representative therefore respectfully submits that the Chapter 15 Debtors have commenced the Canadian Proceeding for a reorganization purpose, as required by § 101(23).

93. Courts frequently recognize that a Canadian restructuring proceeding under the CBCA constitutes a "foreign proceeding." *See, e.g., In re Catalyst Paper Corporation*, Case No. 16-1112419 (CSS), Dkt. No. 72 (Bankr. D. Del. Jan. 20, 2017) (granting recognition of a proceeding under the CBCA as a foreign main proceeding); *In re Mega Brands Inc.*, Case No. 10-10485 (CSS), Dkt. No. 39 (Bankr. D. Del. Mar. 23, 2010) (same); *In re Tembec Indus., Inc.*, Case No. 08-13435 (RDD), Dkt. No. 14 (Bankr. S.D.N.Y. Oct. 31, 2008) (same).

94.     Accordingly, this Court should find that the Canadian Proceeding satisfies § 101 (23) and constitutes a "foreign proceeding" as required by § 1517.[7]

## II.     The Foreign Representative Qualifies as a Foreign Representative

95.     In addition to qualifying as a foreign proceeding as defined in the Bankruptcy Code, to obtain recognition under chapter 15, the Canadian Proceeding must have a "foreign representative." See 11 U.S.C. § 1517.

96.     The Foreign Representative submits that he commenced the Chapter 15 Cases as a duly appointed and authorized "foreign representative" within the meaning of § 101(24).  Section 101(24) provides as follows: "The term 'foreign representative' means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

---

[7]     In addition, the Foreign Representative submits that recognition of the Canadian Proceeding and any orders that issue from the Canadian Court during the pendency of the Canadian Proceeding would not be "manifestly contrary to the public policy of the United States" so as to justify this Court's exercise of its discretion under Bankruptcy Code § 1506 to refuse to recognize the Canadian Proceeding. Indeed, as a sister common law jurisdiction, courts "have consistently extended comity to Canadian bankruptcy proceedings." *Smith v. Dominion Bridge Corp.,* 1999 WL 111465, at *3 (E.D. Pa. 1999).

97.     The Canadian Court specifically authorized the Foreign Representative to commence this chapter 15 proceeding.  Concurrently herewith, and attached hereto as <u>Exhibit B</u>, the Foreign Representative has filed a copy of the order entered by the Canadian Court commencing the Canadian Proceeding and appointing the Foreign Representative with authority to commence the Chapter 15 Cases (the "**<u>Preliminary Interim Order</u>**").  Thus, the Foreign Representative submits that he has met the requirements of § 101(24). *Cf. In re SPhinX, Ltd.*, 351 B.R. 103, 116-17 (Bankr. S.D.N.Y. 2006), aff'd 3 71 B.R. 10 (S.D.N.Y. 2007) (noting that the foreign representatives had submitted a "copy of the Cayman Court's order appointing them to administer the Debtors' winding up under the Companies Law and authorizing their commencement of these chapter 15 cases, thereby satisfying Bankruptcy Code § 101 (24)").

III.     **The Canadian Proceeding is a Foreign Main Proceeding for the Chapter 15 Debtors, or in the Alternative, a Foreign Non-Main Proceeding**

98.     The Canadian Proceeding constitutes a "foreign main proceeding" for the Chapter 15 Debtors as defined in § 1517(b)(l). Section l5l7(b)(1) provides that a "foreign main proceeding" is a "foreign proceeding" pending in the country where the debtor has its center of main interests, or COMI.  11 U.S.C. § 1517(b)(l).  Section 1516(c) provides that, "in the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007), *aff'd* 389 B.R. 325 (S.D.N.Y. 2008). However, the presumption that the location of the debtor's registered office is also the debtor's COMI was adopted merely for "speed" and administrative convenience, and is therefore rebuttable. *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007) (citing H.R. Rep. 109-31, pt. 1, 109th Cong., 1st Sess. at 112-13 (2005)).  And, as described below, courts look to a number of factors to determine a debtor's COMI.  *Bear Stearns*, 374 B.R. at 129-30 (finding that COMI did not lie at the location of the debtor's registered office in the Cayman Islands, as administration of the debtor's business occurred in the U.S., and its principal interests, assets, and management resided in the U.S.).

99.     Though the Bankruptcy Code does not specify the factors to determine a debtor's COMI, courts have generally identified five relevant factors. These factors include: (a) the location of the debtor's headquarters; (b) the location of those persons or entities managing the debtor (which, in certain instances, could be the holding company headquarters); (c) the location of the debtor's primary assets; (d) the location of the majority of the debtor's creditors or of a majority of the creditors affected by the case; and (e) the jurisdiction whose law would apply to most disputes. *Bear Stearns*, 389 B.R. at 336 (citing *SPhinX*, 351 B.R. at 116-17; *In re Tradex Swiss AG*, 384 B.R. 34, 43 (Bankr. D. Mass. 2008)); *Betcorp*, 400 B.R. at 287-88 (discussing *Bear Stearns*, *Tradex* and certain European insolvency law cases for COMI analysis). "The flexibility inherent in chapter 15 strongly suggests, however, that [a] court should not apply such factors mechanically," but with an eye toward "chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *SPhinX*, 351 B.R. at 117.

100.    An analysis of these factors demonstrates that Canada constitutes the Chapter 15 Debtors' COMI.

101.    The Location of the Chapter 15 Debtors' Headquarters. The Chapter 15 Debtors' corporate headquarters is in Calgary, Canada.

102.    The Location of Those Persons or Entities Managing the Chapter 15 Debtors. As stated above, the large majority of the Chapter 15 Debtors' directors and/or executive officers reside and work in Calgary, Canada. Further, all strategic planning and key decision-making for the Chapter 15 Debtors takes place in Canada.

103.     <u>The Location of the Chapter 15 Debtors' Primary Assets</u>.  While the Chapter 15 Debtors hold valuable assets in the United States, their assets in Canada are also significant and are key to their businesses.  Furthermore, the Chapter 15 Debtors have more employees in Canada than in any other country, including the United States (as of June 2020, the Chapter 15 Debtors had 634 employees in Canada, compared to 399 employees in the United States).

104.     <u>The Location of the Majority of the Chapter 15 Debtors' Creditors Affected By the Canadian Proceeding</u>.  Holders of the Unsecured Notes are the only Chapter 15 Debtors' Creditors affected by the Canadian Proceeding.  The Unsecured Note Trustee is located in the United States.

105.     <u>The Jurisdiction Whose Law Would Apply To Most Disputes</u>.  The Credit Facility is governed by the laws of Canada applicable therein.  The Second Lien Notes and the Unsecured Notes are governed by the laws of the State of New York.  As for the Recapitalization Transaction, the relevant agreements identify Canadian law as governing disputes.

106.     The Foreign Representative respectfully submits that the aforementioned factors, on balance, weigh in favor of a finding that the Chapter 15 Debtors' COMI lies in Canada, and that this Court should accordingly reach that finding and recognize the Canadian Proceeding as a "foreign main proceeding" under § 1517(b) with respect to the Chapter 15 Debtors.  At a minimum, the Foreign Representative respectfully submits that the aforementioned factors establish that the Chapter 15 Debtors have an "establishment" in Canada within the meaning of § 1502(2) of the Bankruptcy Code, and that, accordingly and in the alternative, the Court should recognize the Canadian Proceeding as a "foreign non-main proceeding" within the meaning of § 1502(5) of the Bankruptcy Code.

## IV.    The Court Should Recognize and Enforce the Canadian Court's Orders

107.    Enforcement and recognition of the Canadian Court's orders in connection with the Canadian Proceeding aligns with the purposes of chapter 15 and the Canadian Proceeding, and the Court should give such orders full force and effect.  As set forth in the preamble to the Model Law on Cross-Border Insolvency, the Model Law seeks to promote: "(a) cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency; (b) greater legal certainty for trade and investment; (c) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor; (d) protection and maximization of the value of the debtor's assets; and (e) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment."  *See Model Law on Cross-Border Insolvency,* available at www.uncitral.org.

108.    Bankruptcy Code § 1521(a) permits the Court to, "where necessary to effectuate the purpose of [chapter 15] ... at the request of the foreign representative, grant any appropriate relief." 11 U.S.C. § § 1521(a).  Section 1521 also sets forth various forms of relief that may be granted upon recognition of a foreign proceeding, including "entrust[ing] the distribution of all or part of the debtor's assets in the U.S. to the foreign representative." 11 U.S.C. § 1521(b). Further, §§ 1525 and 1527, when read in conjunction, direct this Court to cooperate "to the maximum extent possible" with the Canadian Court regarding "the coordination of the administration and supervision" of the Chapter 15 Debtors' assets and affairs. 11 U.S.C. §§ 1525, 1527(3).

109.    Here, recognition and enforcement of the Canadian Court's orders certainly serves the purposes of chapter 15 and the Canadian Proceeding.  The Chapter 15 Debtors' restructuring and the Canadian Proceeding rely on a highly choreographed and detailed set of steps and transactions.  Without deference to the Canadian Proceeding, and enforcement of Canadian Court orders in the U.S., the Chapter 15 Debtors cannot obtain certainty and closure in the Recapitalization Transaction, and hence cannot restructure.

110.    In short, the Canadian restructuring cannot happen without U.S. Court assistance, and the Foreign Representative respectfully submits that under the circumstances the Chapter 15 Debtors represent the proverbial "poster children" for the relief requested herein.

## CONCLUSION

111.    The Foreign Representative respectfully submits that the Petition satisfies the requirements for recognition of: the Canadian Proceeding as a "foreign main proceeding" with respect to the Chapter 15 Debtors, and Ronald P. Mathison as the Chapter 15 Debtors' "foreign representative."   Further, the Court should recognize the Canadian Court orders issued in connection therewith.

## NOTICE

112.    The Foreign Representative has provided notice of the Petition, pursuant to Bankruptcy Rule 2002(q), to: (a) the Office of the United States Trustee; (b) the Securities and Exchange Commission; (c) all parties to litigation currently pending in the United States in which any of the Chapter 15 Debtors is a party; (d) the First Lien Agent; (e) the Second Lien Note Trustee; (f) the Unsecured Note Trustee; and (g) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware.  In light of the relief requested, the Foreign Representative submits that no further notice is necessary.

## NO PRIOR REQUEST

113.    No prior request for the relief sought in this Petition has been made to this or any other court.

WHEREFORE, the Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as is just and proper.

Dated: July 14, 2020

**LATHAM & WATKINS LLP**

/s/ *Caroline A. Reckler*

Caroline A. Reckler (IL 6275746)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: caroline.reckler@lw.com

-and-

Adam J. Goldberg (*pro hac vice* admission pending)
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Fax: (212) 751-4864
Email: adam.goldberg@lw.com

-and-

**PORTER HEDGES LLP**

John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 226-6248
Email: jhiggins@porterhedges.com
          eenglish@porterhedges.com

*Co-Counsel to the Foreign Representative and the Debtors*